## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER PAUL TIDD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:14-CV-2023-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On May 20, 2011, the claimant, Christopher Paul Tidd, filed an application for Period of Disability and Disability Insurance Benefits ("SSDI"). (R. 107). The claimant alleged disability beginning October 8, 2010, because of migraines with vertigo and degenerative disc disease ("DDD") of the lumbar spine with radiculitis[1] and cervicalgia.[2] (R. 68, 425-27). The Social Security Administration denied the claim initially on August 16, 2011. (R. 71). On September 8, 2011, the claimant filed a written request for a hearing before an Administrative Law Judge. (R. 79). The ALJ subsequently held a video hearing on February 4, 2013. (R. 43).

In a decision dated March 6, 2013, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for SSDI benefits. (R. 1). On August

---

[1]Radiculitis is defined as transferred pain that is "radiated" along the path of a nerve due to pressure on the nerve root at its connection to the spinal column.

[2]Cervicalgia is defined as neck pain, sometimes originating from spine compression.

1

25, 2014, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether the ALJ erred by giving the claimant's treating physician's opinions little weight based on a perceived inconsistency in that physician's records, which resulted from the ALJ's misinterpretation of the record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are

not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

3

An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When evaluating a claimant's application for Social Security benefits, the ALJ must give "substantial weight" to the opinions of the claimant's treating physician, unless "good cause exists for not heeding the treating physician's diagnosis." *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). The Eleventh Circuit Court of Appeals has held that "good cause" exists where: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (internal citations omitted). If an ALJ disregards or accords less weight to a treating physician's opinion, he or she must clearly state the grounds for doing so. *Id.* Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are not supported by substantial evidence, the ALJ commits reversible error. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

Where the "ALJ misread the record evidence" to include an inconsistency that did not exist in the facts, to the extent that the ALJ relied on a non-existent inconsistency in discrediting the opinion, "the ALJ's decision to give an opinion 'no weight' is not supported by substantial record evidence." *Davis v. Astrue*, 346 F. App'x 439, 441 (11th Cir. 2008). "If an ALJ misinterprets evidence that could influence his conclusion, a remand is appropriate." *Lee v. Colvin*, No. 2:12-CV-2935, 2014 WL 1338173, at *2 (N.D. Ala. Mar. 31, 2014) (citations omitted).

## V. FACTS

The claimant was twenty-eight years old at the time of the ALJ's decision. (R. 157). He has

4

a high school education, and his past work experience includes employment as a fast food cook, cardboard feeder, and ceramic floor cleaner. (R. 157). The claimant alleged disability beginning on October 8, 2010. (R. 68). The claimant alleged that he was unable to work because of headaches with vertigo and DDD of the lumbar spine with radiculitis and cervicalgia. (R. 68, 425-27). The claimant, however, stressed that his frequent migraines with vertigo are the primary reason that he is unable to work. (R. 509-10).

*Physical Limitations*

On October 11, 2010, Dr. Myers treated the claimant at River Oaks Family Medicine & Urgent Care, for complaints of a sore throat, sinus congestion, dizziness, and sinus drainage. The claimant was diagnosed with vertigo and sinus congestion. (R. 219). On October 14 and 18, 2010, the claimant followed up with Dr. Myers with the same complaints. In particular, the claimant described no improvement in his pain. Dr. Myers performed chest and sinus x-rays before diagnosing the claimant with sinusitis and bronchitis. Dr. Myers referred the claimant to an ENT specialist for further evaluation following these visits. (R. 215-18). Additionally, Dr. Myers performed a hearing test, noting that the claimant's hearing was excellent. Dr. Myers diagnosed the claimant with a minor ear infection and vertigo. (R. 213).

On October 18, 2010, the claimant saw Dr. Morgan, an ENT specialist at ENT Associates of Alabama-Cullman. The claimant complained of an upper respiratory infection, sinus infection, and dizziness beginning on October 9, 2010. Dr. Morgan noted that the claimant had experienced "spinning that [lasted] about 10 seconds" and occasional nausea from moving his head quickly to the left or right and up or down. Dr. Morgan diagnosed the claimant with vertigo and scheduled a videonystagmography ("VNG") test and follow up. (R. 224-25).

The claimant underwent a VNG test on October 27, 2010 that showed no abnormalities. (R.

5

230, 266). Following the negative VNG, Dr. Morgan ordered an MRI of the claimant's brain and on October 29, 2010 noted that the claimant stated after that test that his vertigo was getting better, but that he was tired. (R. 258).

On November 1, 2010, the claimant underwent a brain MRI showing no identifiable diagnostic abnormality. (R. 226). Dr. Morgan noted during a follow up on November 3, 2010 that, though both the VNG and MRI were negative, the claimant continued to complain of vertigo that became worse when he moves. Dr. Morgan diagnosed the claimant with vertigo, but was unsure of the source, and referred the claimant to a neurologist for evaluation. (R. 257).

Dr. Morgan wrote a letter on December 2, 2010, stating that he treated the claimant beginning in October 2010 for "significant disequilibrium which is worse when he moves his head quickly to the left or right." Dr. Morgan expressed concern that, if the claimant's work involved moving his head or stepping up on platforms, he could have an accident. In addition, Dr. Morgan specifically noted that the claimant could work so long as precautions were taken to limit the claimant's head movements and "extensive movement up and down ladders." (R. 282).

On December 8, 2010, Dr. Swader, a neurologist, saw the claimant at Cullman Primary Care Neurology. The claimant complained of constant lightheadedness and floating sensations. The claimant also noted a history of headaches, but did not associate it with his complained vertigo. Dr. Swader diagnosed the claimant with vertigo and prescribed him Topamax (used to treat seizures and migraine headaches). (R. 284-85).

When claimant again saw Dr. Swader on January 19, 2011, he stated that he sometimes has constant vertigo all day, resulting in trouble balancing and drowsiness. Dr. Swader was unsure of the etiology of the claimant's vertigo symptoms and ordered a sleep-deprived EEG and lumbar puncture. (R. 299-300). Dr. Swader performed a lumbar puncture on the claimant on February 10, 2011. After

the procedure, the claimant complained of low back pain that radiated into his right thigh. Dr. Swader prescribed a muscle relaxer and gave the claimant a decadron shot (used to treat pain in the lower back). (R. 320-21).

The claimant again saw Dr. Swader on February 24, 2011 to follow up regarding the results of the lumbar puncture procedure. The claimant stated that he still suffered from headaches and vertigo, which he said are triggered by watching television. The claimant also complained of lower back pain and sharp pain in his right leg. Dr. Swader concluded that the results of the lumbar puncture were unremarkable. Dr. Swader additionally noted that the claimant would be applying for long term disability and that she will be sending a functional capacity evaluation. Finally, Dr. Swader stated that the claimant did not want to undergo a recommended sleep EEG or MRI of his lower back because the out-of-pocket costs were too high. (R. 322-24). Dr. Swader again examined the claimant on March 22, 2011, noting little change in the claimant's symptoms, which were not responding to medication. (R. 225-27).

On March 23, 2011, Dr. Charles Brock, a neurologist reviewing the claimant's records on behalf of the claimant's employer, International Paper Co., opined that the claimant was able to carry out his job as of April 1, 2011. Dr. Brock stated that the objective medical evidence did not support the claimant's dizziness and vertigo symptoms. Specifically, he opined that the claimant could work based on the evidence that he had returned normal results in VNG, MRI, and physical examinations. Dr. Brock did suggest limiting the claimant's use of heavy machinery and working at heights. (R. 302-04).

On March 29, 2011, Dr. Swader spoke with Dr. Charles Brock regarding the work restrictions she would recommend for the claimant because of his vertigo symptoms. Dr. Swader noted that she would limit driving, despite the claimant being able to drive to his appointments. In addition, Dr.

Swader suggested that she would "limit any heavy machinery or heavy lifting or working on heights, however a sedentary job is within reasonable guidelines."   Dr. Brock acknowledged these limitations. (R. 328).

On May 23, 2011, the claimant followed up with Dr. Swader regarding his symptoms of vertigo. (R. 310-11). The claimant stated that he had fallen out of bed twice and his legs had given out from under him. Additionally, the claimant complained of daily, constant headaches that only felt better if he slept. The claimant additionally complained of problems with stuttering, loss of speech, numbness in his arms and legs, and difficulty concentrating. Dr. Swader prescribed him Elavil (normally prescribed to treat depression), noting that she only did so because the claimant cannot afford the out-of-pocket costs to get a sleep-study test. (R. 311-12).

The claimant saw Dr. Swader on July 25, 2011 to follow up on his vertigo symptoms. The claimant again complained that he had fallen on two occasions and had continued to have daily headaches and dizziness that come and go in different severities. The claimant stated that he was not experiencing headaches or vertigo at the time of either fall, but did complain of lower back pain and numbness in his left leg. Dr. Swader prescribed the claimant gabapentin (commonly used to treat seizures and nerve pain) and encouraged him to maintain a headache calendar. (R. 350-52).

On August 11, 2011, medical consultant Dr. Richard Walker completed a physical residual functional capacity ("RFC") assessment on the claimant. Dr. Walker did not examine the claimant in person, but completed this assessment based on the entirety of the claimant's medical records. In addition, Dr. Walker noted that the claimant's chief complaints were dizziness, vertigo, headaches, and blackouts.  Dr. Walker stated that the claimant could occasionally lift twenty pounds, frequently lift ten pounds, sit or stand for six hours a day, and push or pull an unlimited amount. Dr. Walker opined that the claimant could not climb ladders or ropes, but could occasionally climb ramps or

8

stairs, and frequently balance, stoop, kneel, crouch, or crawl. Furthermore, Dr. Walker rated the claimant's headaches and vertigo as a "greater than not severe" medical impairment. (R. 376). Dr. Walker noted that the claimant complied with prescribed therapy and lived a lightly active lifestyle. Dr. Walker concluded that the medical evidence did not support the alleged functional limitations, which are only partially credible. (R. 370-76).

On November 7, 2011, the claimant underwent a tilt table test at Princeton Baptist Medical Center Department of Cardiac Electrophysology. The test results were negative. (R. 390).

The claimant saw Dr. Swader on November 28, 2011. The claimant complained of continued dizzy spells and headaches that he described as a head rush. The claimant rated his headache pain at a 4/10 at its worst. Dr. Swader noted that his work up, thus far, remained unremarkable. (R. 385-87). At the suggestion of Dr. Swader, the claimant underwent a 72 hour ambulatory EEG test with continuous monitoring on December 20, 2011. Although the claimant complained of several headaches, dizzy spells, and extreme lightheadedness during the examination, Dr. Swader noted that all results from the test were normal, with no evidence of significant cardiac arrhythmia. (R. 384).

On December 27, 2011 . Dr. Swader evaluated the claimant and opined that the claimant's headaches are related to "complicated migraines." The claimant complained that he had headaches three to four times per day and has not had any relief from medication. Dr. Swader prescribed a serotonin reptake drug to attempt to alleviate headache symptoms. (R. 380-83).

On February 28, 2012, the claimant again saw Dr. Swader. The claimant reported that his symptoms related to headaches and dizzy spells were much improved. The claimant stated that he only occasionally had headaches and rarely had dizzy spells. The claimant's headache chart showed only one headache in the prior week. The claimant additionally complained of neck pain. Dr. Swader concluded that the claimant had some improvement with his symptoms, which she attributed to

9

medication. Dr. Swader noted that the arthritis in his neck was worse than initially appreciated.

On March 2, 2012, the claimant underwent a MRI of the cervical spine. The MRI showed a "very minimal" disc bulge that appeared insignificant. The report concluded that the results of the MRI were "essentially normal." (R. 389). In addition, the claimant's counsel spoke with Dr. Swader over the telephone on May 8, 2012 regarding the claimant's physical condition. Dr. Swader noted in the claimant's chart that, during the phone call, she told the claimant's counsel that the claimant likely has intractable complicated migraines with vertigo, which "could be disabling and be disruptive to job tasks." (R. 412).

On May 25, 2012, Dr. Swader wrote a letter on behalf of the claimant in response to the claimant's appointment of representation in connection with his Social Security disability determination. Dr. Swader's letter began by explaining the claimant's underlying medical problems from December 2010 to the time the letter was penned. Dr. Swader explained that the claimant had suffered from headaches and vertigo, prompting a final diagnosis of intractable complicated migraines resulting in dizziness. Dr. Swader stated that the claimant underwent VNG, MRI, tilt table, EEG, and lumbar puncture tests, which all produced negative results. Dr. Swader then explained that migraines are very different from headaches and result from a vascular phenomenon of low blood flow to the brain. Dr. Swader wrote that the medical opinions of the reviewing physician, who opined that the claimant was not disabled because of the absence of objective medical evidence, were not consistent with record. Dr. Swader asserted that the claimant had shown that he was disabled because he had suffered consistently from migraines for a long time, complied with prescribed treatments, underwent all requested tests, and was seemingly motivated to work. Furthermore, Dr. Swader opined that the claimant's functional limitations could vary from day to day, on an unpredictable basis, making him an unreliable employee. (R. 398-99).

10

On May 29, 2012, the claimant visited Dr. Swader for a follow up regarding his headaches and vertigo. Dr. Swader noted that the claimant had four to five headaches per week, each lasting about four hours. The claimant stated that, on average, these headaches were a 7/10 on the pain scale. The claimant reported that his headaches are usually frontal in location and pounding. The claimant additionally reported neck pain and numbness in his legs. Dr. Swader prescribed the claimant additional medication to help with the frequent headaches. (R. 407-09).

On June 14, 2012, a certified disability management specialist, Mr. John Long, reviewed the claimant's medical records to determine the claimant's eligibility for long-term diasability. Mr. Long opined that the claimant's unpredictable headaches and dizziness made him an unreliable employee. Mr. Long based this opinion on the medical records from Dr. Swader. Mr. Long stated that, though people who suffer from unpredictable physical impairments, like the claimant, may have the physical capacity to work, they may be unable to sustain employment because of their inability to concentrate or inadequate attendance. Mr. Long opined that the claimant would be unable to meet the requirements of holding an occupation because his frequent headaches and dizziness would keep him from "maintaining the persistence, pace or work adequate attendance necessary for any other type of competitive employment." (R. 399-400).

On July 10, 2012, the claimant followed up with Dr. Swader regarding his headaches and vertigo. The claimant complained that he had fallen recently because of numbness in his left leg, which had since caused him significant pain. The claimant additionally complained that he had lower back pain that radiated to his right leg. The claimant noticed an increase in pain and headaches since the fall, which medication had not alleviated. (R. 401-03). On the same day, the claimant underwent an MRI of the lumbar spine to check for a herniated disc. The results of the MRI showed that the claimant had disc extrusions at the left L5-S1 and Central L4-5 discs. (R. 424).

11

On November 26, 2012, the claimant again saw Dr. Swader in her office. Dr. Swader noted that the claimant continued to have daily headaches that are global in nature, but noted that with medication these headaches were "tolerable." The claimant complained of lower back pain resulting from a fall on July 2, 2012, which resulted in disc extrusions. The claimant further complained that nothing had helped alleviate this pain. Dr. Swader ordered epidural injections for the claimant's lower back pain and continued the same medication regime for the claimant's headaches. (R. 425-27). The claimant had the prescribed epidural injections on November 30 and December 7, 2012. (R. 432, 438).

The claimant again followed up with Dr. Swader on February 26, 2013. The claimant stated that he had a constant, but not severe, headache that got worse only a couple times per week. In addition, the claimant complained of vertigo and lower back pain. Dr. Swader noted that the current medication regime was not working to control his back pain. Dr. Swader also noted that the claimant was awaiting disability and might need a functional capacity evaluation. (R. 497-99).

On March 19, 2013, the claimant saw Dr. Copeland at Decatur ENT Associates for an evaluation of his dizziness. Claimant complained that he had suffered from dizziness for two-and-a-half years without improvement. The claimant stated that he got dizzy two to three times per week, which was usually accompanied by headaches. Dr. Copeland ordered a complete audio test, Tympanogram, VNG, ECOG, and VEMP tests to attempt to diagnose the cause of the claimant's complaints.

The claimant presented for the testing prescribed by Dr. Copeland on March 25, 2013. The VEMP and ECOG tests returned normal results. The claimant had normal results on the VNG test, except that there was a 21% caloric weakness in his right ear. The exam notes, written by the audiologist performing the tests, stated that the claimant complained of intermittent pain and

pressure in his right ear. The claimant also reported that when he was five years old he hit the right side of his head on a table, requiring stitches, and was in a severe car wreck later in 2006, resulting in back pain. (R. 485).

On April 2, 2013, the claimant followed up with Dr. Copeland regarding the claimant's dizzy spells. Dr. Copeland diagnosed the claimant with migraines, dizziness, and possible Meniere's Disease. The claimant was prescribed medication for his migraine headaches and told to go on a low sodium diet. (R. 477-79).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for Social Security disability insurance, the claimant requested and received a hearing before an ALJ. The hearing took place via video conference on February 4, 2013. (R. 503). At the hearing, the claimant testified that he was unable to  work because of severe headaches and vertigo. The claimant described that on October 8, 2010, he woke up feeling dizzy and did not report to work because he did not think he was fit to work around heavy machinery. He then stated that he never returned to work after that day, nor had he tried to get a job that did not involve heavy machinery. The claimant further explained that he uses a cane to keep himself from falling, but no doctor had prescribed the cane. (R. 509-10).

The claimant stated that recently his headaches have only been occurring once or twice a week for the past month, but that he had headaches up to five times a week previously. He was unsure why the headaches have occurred less often because he has not been doing anything differently in his daily routine. Additionally, the claimant testified that, normally when he has headaches, he also experiences vertigo. He described the vertigo as being like he is on a merry-go-round that can go faster and faster, depending on the severity. (R. 510-11).

The claimant stated that he had fallen ten times and had vomited twice because of vertigo

13

symptoms since 2012. The claimant recalled that he had only vomited once before, in October of 2010. He additionally stated that he sees Dr. Swader every three months regarding his headaches and vertigo. The claimant also noted that he is taking Prozac, naproxen, and Baclofen to attempt to subside some of the dizziness he experiences. He further acknowledged that the Prozac and naproxen help alleviate his headache and vertigo symptoms. The claimant testified that he smokes five to six cigarettes a day, which is down from the pack a day he used to smoke. He also stated that he only drinks alcohol once or twice per year. (R. 512-13).

The claimant described that on a typical day he wakes up at 8:00 in the morning and takes his medication. He then stated that he checks his email and sits at his computer for an hour until his medication makes him sleepy. The claimant then disclosed that he sleeps for five to six hours after that. Finally, the claimant stated that he eats and then watches television and browses the internet, until he takes his nightly medication and goes to bed at 7:00 or 8:00 at night. The claimant stated that he uses Facebook on occasion, but mainly when someone messages him or tells him to check something out. He also testified that he spends a couple hours a day playing video games. Additionally, the claimant stated that he does not drive and relies on his mom or girlfriend to get to his appointments. (R. 513-14).

The claimant professed that his only source of income is long-term disability from International Paper totaling around $890 per month. (R. 515-16). Additionally, the claimant stated that the biggest issue preventing him from working is that his headaches and dizziness which preclude him from standing up or walking around for too long. He further explained that his back bothers him when he sits, but he usually does not have dizziness when sitting. The claimant testified that lights from the computer or video games can cause him to get dizzy, but that he discontinues their use once he feels dizziness coming on. The claimant further stated that he only leaves his

14

apartment once a week to check his mail and that his girlfriend comes over about once or twice a week. (R. 516-17). Furthermore, the claimant attested that, when his children visit him, he has to have help from his sister or girlfriend. He stated that he does not attend any of the children's school events and that he is considered a noncustodial parent.(R. 517-18).

In response to his attorney's questioning, the claimant stated that his girlfriend drove him to the hearing. The claimant testified that he has a mild headache all of the time, but has severe headaches once or twice a week. He stated that he has sensitivity to light when his headaches get to be a 5/10 on the pain scale. When his headaches worsen, he takes medication and lies down to alleviate some of the pain. He further noted that when he lies down, he is usually unable to focus on what he is doing. (R. 518-21). When he gets severe headaches but cannot lie down, he has to sit and recline or the pain becomes unbearable. He stated that he usually has to lie down anywhere from two to three hours at a time. He additionally described that he becomes nauseated when he experiences dizziness episodes, but does not usually vomit. Furthermore, the claimant noted that he sometimes gets a headache without dizziness or dizziness without a headache, though usually they occur at the same time. (R. 521-23).

The claimant stated that his headaches fluctuate in severity and frequency. He testified that he has tried all the medication prescribed by Dr. Swader and only Naproxen has been effective in alleviating his symptoms. The claimant also stated that he has lower back pain that has resulted in left leg numbness. He testified that he has received two epidural injections, but they have not helped with the pain. (R. 523-25).

The ALJ then examined Dr. Jewel Euto, a qualified vocational expert. Dr. Euto stated that she reviewed the claimant's file in preparation for the hearing. Dr. Euto summarized that the claimant has 13 years of education and some vocational training. She classified the claimant's past

15

job as a fast food worker as a "light" exertional level and a Specific Vocational Preparation Level ("SVP") of 2. She classified the the claimant's job as a laborer as having an exertional level of "medium," with a SVP of 2. Additionally, she classified the claimant's most recent job as a box maker as an exertional level of "medium," with a SVP of 2. (R. 526-27).

The ALJ asked Dr. Euto to assume a hypothetical person of the claimant's age, education, and work history, who is capable of performing light work, with the following limitations: could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch, and crawl; could tolerate occasional exposure to fumes, odors, dust, gases, and poorly ventilated areas; and should avoid all exposure to operational control of hazardous machinery and unprotected heights or bodies of liquid. The ALJ asked Dr. Euto whether, if the ALJ found these limitations credible, such a person would be able to engage in any of his past work. Dr. Euto responded that he could perform his job as fast food worker. (R. 527-28).

The ALJ next asked Dr. Euto if adding the limitation that the person would be capable of maintaining attention, concentration, persistence, and pace in two-hour segments of time with customary breaks would be capable of performing any of the claimant's past work.  Dr. Euto responded that he could work as a fast food worker. The ALJ then asked if a person who has occasional difficulty maintaining attention, concentration, persistence, and pace, and would miss two or more days of work per month due to limitations and treatment for those limitations could perform any of the claimant's past work. Dr. Euto responded that such a person could not perform any jobs with such limitations. (R. 528-29).

The claimant's attorney asked Dr. Euto if employers related to the claimant's past work have a generally recognized tolerance of absenteeism. Dr. Euto testified that, in Alabama, an unskilled employee has six days of sick leave and up to eight days of vacation, which accrue across the first

year. In addition, Dr. Euto stated that the first six months of employment are usually on a trial basis with no acceptable absenteeism. Dr. Euto agreed with the claimant's counsel that missing more than one day per month would probably result in dismissal from an unskilled job. (R. 529-30).

The claimant's counsel then asked Dr. Euto if a person could sustain competitive employment if he suffers from unpredictable, complicated migraines and dizziness that can be debilitating and would seriously distract from the performance of job tasks several days per week, anywhere from minutes to hours. Dr. Euto responded that any person who would be off task for 10 to 15 percent of the workday would be unemployable. (R. 230-31).

*The ALJ's Decision*

On March 6, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant had not engaged in substantial gainful activity since his alleged disability began on October 8, 2010 . (R. 31).

Next, the ALJ found that the claimant had the following severe impairments: migraines with vertigo and DDD of the lumbar spine with radiculitis and cervicalgia. The ALJ did not note any additional severe or non-severe impairments, but concluded that the listed conditions would cause limitations to the claimant's ability to perform basic work activities. Additionally, the ALJ noted that the claimant does not have an impairment, or combination of them, that meets or medically equals the severity of a listed impairment. (R. 31).

After considering the entire record, the ALJ found that the claimant has the residual functional capacity to perform a range of "light work." The ALJ continued that the claimant is capable of occasional balancing, stooping, kneeling, crouching, crawling, and climbing stairs, but could never climb ladders, ropes or scaffolds. The ALJ also concluded that the claimant can tolerate occasional exposure to pulmonary irritants, but can have no exposure to hazards, machinery,

unprotected heights or bodies of liquid. Furthermore, the ALJ decided that the claimant is capable of maintaining attention, concentration, persistence or pace for two hour segments with customary breaks, because of pain from his physical impairments. (R. 31-32).

The ALJ considered all of the claimant's symptoms, objective medical evidence, medical opinions, and other evidence to make her decision. The ALJ considered the claimant's symptoms in a two-step process. First, the ALJ determined that the claimant's alleged disability arose solely from physical impairments. Next, the ALJ determined that though the claimant's symptoms could be caused by medical impairments, the claimant's statements regarding the "intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. 32).

The ALJ detailed the claimant's objective medical history to support its determination that the objective medical evidence did not substantiate the claimant's assertions concerning his symptoms for migraines with vertigo.  The ALJ noted that both a VNG and MRI respectively performed on October 27, 2010 and November 2, 2010, were unable to locate the source of the claimant's migraines, despite the claimant's contention that he was unable to stand in one place for too long without swaying. (R. 32).

The ALJ gave significant weight to the opinions of Dr. Morgan, who was the claimant's treating physician. On December 2, 2010, Dr. Morgan performed multiple tests to locate the source of the migraines and vertigo, but each came back negative. In addition, Dr. Morgan, having been informed that the claimant was applying for disability for vertigo, referred the claimant to a neurologist, Dr. Swader. Dr. Morgan opined that the claimant was capable of continuing his then current job, "so long as precautions were taken to avoid repetitive movement of his head, as well as extensive movement up and down ladders." The ALJ further noted that Dr. Morgan's opinions were

18

generally supported by the treatment notes and "unremarkable objective testing." (R. 32, 34).

The ALJ also gave significant weight to the opinions of Dr. Walker, a state agency medical consultant. Dr. Walker opined that the claimant could lift 20 pounds, sit 6 hours a day, do unlimited pushing and pulling, and frequently balance, stoop, kneel, crouch, or crawl. In addition, Dr. Walker opined that the claimant could climb ramps and stairs occasionally, but never ladders, ropes or scaffolds. Dr. Walker also stated that the claimant should avoid hazards, such as machinery or heights. The ALJ opined that Dr. Walker's opinions were consistent with the record as a whole and supported by the treatment notes and unremarkable testing. However, the ALJ determined that the claimant was slightly more restricted than what Dr. Walker perceived. Furthermore, the ALJ gave significant weight to state agency psychologist, Dr. Williams, who opined that the claimant did not suffer from any mental impairments. (R. 34).

The ALJ gave varying weight to the opinions of Dr. Swader, the claimant's treating physician and neurologist, who gave multiple opinions over the course of treating the claimant. The ALJ gave significant weight to some of Dr. Swader's opinions, but gave little weight to parts of her opinions. (R. 32-34). The ALJ gave significant weight to a medical opinion dated April 1, 2011, which stated that "the lack of objective medical information did not support a complete inability to work." (R. 396-98). The ALJ attributed this opinion to Dr. Swader; however, this opinion was actually given by Dr. Charles Brock, a consulting neurologist who reviewed the records of Dr. Swader, but never actually saw the claimant for evaluation. (R. 302-04).

Furthermore, the ALJ gave little significance to the opinions of Dr. Swader from May 25, 2012. In May 2012, Dr. Swader wrote a letter in support of the claimant's application for long-term disability benefits. In the letter, Dr. Swader indicated that the claimant's migraines and dizziness

would vary in severity from day to day, making him an unreliable employee. The ALJ further noted that Dr. Swader believed that the claimant's symptoms were unpredictable and could last an indeterminable amount of time. The ALJ stated that she did not give significance to the May 2012 opinion on the basis that no significant medically objective difference existed in the evidence between her opinion in April 2011 (actually Dr. Brock's opinion) and Dr. Swader's May 2012 opinion. (R. 34-35).

The ALJ gave no weight to the opinions of Mr. John M. Long that the claimant's headaches and dizziness would make him an unreliable employee. The ALJ held that Mr. Long's opinions were inconsistent with the record and that Mr. Long was not an acceptable medical source under the Social Security Act. Furthermore, the ALJ noted that Mr. Long never examined the claimant, but only reviewed evidence given to him by the claimant's representative. Therefore, the ALJ gave no significance to Mr. Long's opinions. (R. 35).

The ALJ held that, while the claimant's general allegations and contentions of headaches and vertigo are credible, the evidence in the record did not support the claimant's characterization of the nature and severity of his symptoms. In addition, the ALJ found that the claimant was capable of performing past relevant work in his residual functional capacity, as a vocational expert determined. The vocational expert, Dr. Euto, testified that a worker with symptoms and limitations of the claimant was capable of performing work as a fast food worker. In making this determination, Dr. Euto compared such a worker's residual functional capacity with the physical demands of working as a fast food employee, which requires only light and unskilled labor. (R. 35-36).

In sum, the ALJ, having reviewed the entirety of the record, decided that the claimant was not disabled under the Social Security Act and, therefore, was ineligible to receive Period of

Disability and SSDI benefits. (R. 36).

## VI. DISCUSSION

Substantial evidence does not support the ALJ's decision to deny the claimant Social Security benefits because the ALJ gave little weight to the treating physician's opinions based on an inconsistency in the treating physician's records that did not exist. The ALJ committed reversible error by basing her decision on an incorrect interpretation of the evidence.

The claimant argues that the ALJ committed reversible error in making her decision to deny the claimant application for Period of Disability and SSDI benefits, when she mistook the opinion of a consulting physician, Dr. Brock, as being the opinion of the claimant's treating physician, Dr. Swader. This court agrees that the ALJ erred in discrediting the treating physician's medical opinions based on a mistake in the ALJ's interpretation of the evidence, and it finds that the ALJ's decision is due to be reversed and remanded.

When deciding a Social Security claim, an ALJ must show that good cause exists to assign anything other than "substantial weight" to a treating physician's medical opinions. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). An ALJ who finds good cause in an inconsistency in a treating physician's medical records must show that substantial evidence supports that finding. *See Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005). Substantial evidence does not support an ALJ's reliance on a non-existent inconsistency, based on the ALJ's misinterpretation of the evidence, and, thus, such a misinterpretation is grounds for remand. *Lee v. Colvin*, No. 2:12-CV-2935, 2014 WL 1338173, at *2 (N.D. Ala. Mar. 31, 2014)*.

Not every mistake or misstatement requires reversal of an ALJ's decision. *See id.* at *12 (citing *Perez Torres v. Sec'y of Health and Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989)

21

(finding that an ALJ's mistake regarding the severity of the claimant's emotional impairment was a harmless error and did not justify reversal). However, if an ALJ makes a mistake regarding a treating physician's opinion, and affords that treating physician's opinion less than significant weight based on the ALJ's mistake, the decision must be remanded to correct that mistake. *See Lee v. Colvin*, 2014 WL 1338173, at *12. Furthermore, the court evaluating an ALJ's mistake on appeal is not tasked with hypothesizing what an ALJ might have done had she interpreted the record correctly. *Id.*

The ALJ relied heavily on some of the medical opinions of Dr. Swader in her decision to deny the claimant Social Security benefits. Dr. Swader has been the claimant's treating neurologist for nearly the entirety of the claimant's headache and vertigo symptoms. As the main treating physician of the claimant's headache and vertigo symptoms, Dr. Swader's medical opinions are an important evidentiary basis for determining the claimant's disability status and the credibility of the claimant's allegations of their severity. The ALJ must give significant weight to Dr. Swader's opinions, absent a showing of good cause. *See Edwards v. Sullivan*, 937 F.2d at 583.

In her decision, the ALJ gave varying weight to Dr. Swader's medical opinions of the claimant. The ALJ gave significant weight to an opinion that the claimant was not disabled and could perform his current job, which the ALJ misidentified as Dr. Swader's opinion from April 2011 that was instead from Dr. Brock, a reviewing physician. The ALJ, however, gave little weight to Dr. Swader's opinion from May 2012, stating that the claimant could not work in his current condition. Thus, the ALJ was required to show good cause for not giving significant weight to all of Dr. Swader's opinions.

The ALJ justified her treatment of Dr. Swader's May 2012 opinion by finding that the

22

opinions in April 2011 (Dr. Brock's opinion) and May 2012 (Dr. Swader's opinion) were inconsistent with one another and that  no evidentiary basis existed for the reversal of her opinion. The ALJ summarized her finding of good cause to not give significant weight to all of Dr. Swader's medical opinions as follows:

> I accord significant weight to part of Dr. Swader's opinion and little weight to part of her opinion. I accord significant weight to the April 2011 opinion by Dr. Swader for the reasons she, herself notes in the opinion (i.e. the absence of objective medical information to support a complete inability to work). As for her opinions of May 2012, I accord little weight, as there is no significant medically objective difference in the evidence of record between April 2011 and May 2012. (R. 33-34).

In sum, because the ALJ perceived an inconsistency in Dr. Swader's opinion evidence and found no medical reason for the change in opinion, the ALJ gave little weight to Dr. Swader's opinion that the claimant would not make a reliable employee, unless his symptoms significantly improved.

However, the ALJ was mistaken in her perception that an inconsistency existed in the opinions of Dr. Swader. (R. 304-05).  When discussing the April 2011 medical opinion, the ALJ cited to "Exhibit 3F, p. 61." However, "Exhibit 3F" is actually the report of Dr. Brock, which the ALJ quoted verbatim. (*Id.*). Contrary to the ALJ's findings, Dr. Swader did *not* issue an opinion in April 2011 supporting a conclusion that the claimant could continue to work.

Furthermore, the ALJ made her decision to deny the claimant's application for Social Security benefits based on the lack of credibility regarding the "intensity, persistence and limiting effects of these symptoms." (R. 32). The ALJ, however, may have come to a different conclusion had she given significant weight to Dr. Swader's opinion in her letter from May 2012 that explained in detail the claimant's headache and vertigo symptoms. In particular, the letter explained how the claimant's symptoms and complaints are in-line with the medically accepted symptoms. This information and

23

opinion is relevant and significant in evaluating the credibility of the claimant's complaints as to the severity and persistence of his headaches and vertigo symptoms.

In this instance, the court finds that ALJ did not establish good cause for giving little weight to the Dr. Swader's opinions. Absent good cause, she must accept Dr. Swader's opinions, and her failure to do so means that substantial evidence does not support her decision.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the Commissioner's decision, and it is due to be REVERSED and REMANDED. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 7th day of March, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

24